**Rose Ann MCGURRIN EHRHARD,**
**Plaintiff, Appellant,**

v.

**Michael Joseph CONNOLLY, etc., et al., Defendants, Appellees.**

**No. 88–1361.**

United States Court of Appeals,
First Circuit.

Heard Dec. 9, 1988.

Decided Feb. 8, 1989.

Lawrence R. Ehrhard, Springfield, Mass., for plaintiff, appellant.

Alexander G. Gray, Sp. Asst. Atty. Gen., with whom James M. Shannon, Atty. Gen., was on brief, for defendants, appellees.

Before BOWNES, BREYER and SELYA, Circuit Judges.

BREYER, Circuit Judge.

This "political discharge" case arose in Massachusetts. The appellant, Rose Ann

Ehrhard, claims that the Massachusetts Secretary of State, Michael J. Connolly, dismissed her from her job as director of the Secretary of State's Western Massachusetts office ("SOS West") because she expressed opposition to the Governor at a local political meeting. She says this politically motivated dismissal violated her First Amendment rights. *See Elrod v. Burns,* 427 U.S. 347, 372, 96 S.Ct. 2673, 2689, 49 L.Ed.2d 547 (1976) (political firing violates First Amendment except in policymaking positions); *Branti v. Finkel,* 445 U.S. 507, 518–19, 100 S.Ct. 1287, 1294–95, 63 L.Ed.2d 574 (1980) (political firing violates First Amendment unless political loyalty is an appropriate job requirement). The Secretary says he dismissed her for reasons of competence, not politics.

The district court, setting aside the dispute over the reasons why Ehrhard was fired, directed a verdict for the Secretary on the ground that Ehrhard's job was one for which "party affiliation is an appropriate requirement," *Branti,* 445 U.S. at 518, 100 S.Ct. at 1295, and so her dismissal could not have violated the First Amendment. *Id.* at 517, 100 S.Ct. at 1294. Ehrhard says the court erred in granting the directed verdict, and also by refusing to let her present rebuttal evidence at the trial. After reviewing the record, we affirm the judgment of the district court.

## I.

In deciding whether "party affiliation" is "an appropriate requirement for the effective performance of the public office," *Branti,* 445 U.S. at 518, 100 S.Ct. at 1295, this court has employed a two-part inquiry. We have looked, first, to the nature of the position, asking whether it involves "governmental decisionmaking on issues where there is room for political disagreement on goals or their implementation," and whether "party goals or programs affect the direction, pace, or quality of governance." *Jimenez Fuentes v. Torres Gaztambide,* 807 F.2d 236, 241–42 (1st Cir.1986) (*en banc*). We have also looked to the particular responsibilities of the office holder, asking whether she is "a policymaker, a privy

to confidential information, a communicator, or some other office holder whose function is such that party affiliation is an equally important requirement." *Id.; see also Romero Feliciano v. Torres Gaztambide,* 836 F.2d 1, 3 (1st Cir.1987) (courts must ask, first, "does the position implicate partisan interests?" Then, if so, they must ask whether "the position involves 'policymaking, access to confidential information, communications, or similar functions'").

■ In this case, we have taken the basic facts from the record, determining what happened by viewing the evidence in a light favorable to the plaintiff. *See Rainey v. Gay's Express, Inc.,* 275 F.2d 450, 451 (1st Cir.1960). Whether those facts demonstrate a job that falls within the *Elrod–Branti* "party affiliation" exception, however, is a question of law. In light of the important constitutional and governmental interests surrounding the application of the exception, we believe it the kind of legal question that the court, not the jury, is best suited to determine. *See Branti,* 445 U.S. at 508–11, 100 S.Ct. at 1289–91. Having independently reviewed the record, we find that the job in question falls within the *Branti* exception for positions that legitimately require political affiliation or loyalty.

## II.

The key facts are the following:

1. The Constitution of Massachusetts ranks the Secretary of State third (after the Governor and the Lieutenant Governor), in order of succession. His office, among other things, handles the state census, re-districting, and election procedures, registers corporations, and sells state publications, such as building codes and other regulations. It also provides information about corporations, elections, and state agencies to the public, over the telephone and in person at two offices, a main office in Boston and SOS West. The Secretary's office engages in various activities to promote its services. It sponsors seminars on issues of public interest, and technical seminars for attorneys on the incorporation process. It sponsors a "Voter Hall of

Fame" throughout the state, to honor people who have voted for 50 years or more, and it holds "voter symposiums." In voter districts outside of Boston, it has a program to "bring state government on the road," which involves presenting information about various state agencies.

2. The Secretary of State's office employs 200 to 250 persons. The Secretary himself and his Chief of Staff run the office. Beneath them are 5 Deputy Secretaries of State, and beneath the deputies are 20 Directors. Ehrhard was one of these 20 directors; the Deputy Secretary who supervised her was Monica Graham. All the deputies and most of the directors, including Ehrhard, were designated as holding a "major policymaking position" for purposes of the Massachusetts financial disclosure laws. Mass.Gen.Laws Ann., ch. 268B, § 5 (Supp.1988) (all public employees who hold major policymaking positions must file annual statements of their financial interests).

3. Almost all Secretary of State employees work at the main Boston office. SOS West was staffed only by Ehrhard, two full-time clerical employees, one intern, and one "work/study" student.

4. The Secretary personally hired Ehrhard to direct the Western Office in October 1984. The job was not a civil service position, and Secretary Connolly did not advertise the job, solicit applications, or consider any applicant other than Ehrhard. Ehrhard's only prior work experience was in secretarial and clerical positions. As Ehrhard, in effect, admitted, Connolly hired her in part because she and her husband had worked in his 1984 state senate campaign. (Mr. Ehrhard was Connolly's Western campaign coordinator.)

5. SOS West provided information to citizens in the Western part of the state about corporations, elections, and state rules and regulations. It sold state publications. The office also ran a referral service, directing citizens' problems and inquiries to the proper state agency. Ehrhard described this last function as follows:

The other ... one was CIS, which was Central Information Service. And that was any questions that any of the citizens of the state might have about what —about anything. You know, whether it was something they had read in the paper or whether there was some problem. They didn't know which agency to call. They would call into us. And ... we ... probably could handle calls by either giving them the specific name of a person to speak to, or else telling the specific agency that they really needed to deal with, so CIS was another major part of it.

6. Although Ehrhard did not have final authority to hire and fire employees, she had "input" into SOS West hiring decisions. On one occasion, she interviewed a potential employee, and then met with several deputies and told them he did not have the skills her office needed; he was not hired. She supervised the other SOS West employees. She changed the office working hours, with her supervisor Monica Graham's approval, and she changed office procedures so that information was mailed to citizens directly from SOS West, instead of through the main Boston office. She suggested that SOS West, like the main Boston office, send out a special card, saying "We are glad to have been of service ... MICHAEL J. CONNOLLY," when sending information that citizens had requested through the Central Information Service. Graham approved, and Ehrhard then helped to design the card. Graham also asked Ehrhard for "input" on a brochure concerning SOS West.

Ehrhard also attended monthly directors' meetings, at which the Secretary's future "political strategy" was occasionally discussed. At one of these meetings, in January 1985, a consultant to the Secretary of State described the "public affairs" aspect of the directors' work, which included "marketing," *i.e.*, promoting the office's services to the public, and "political" activities. At about the same time, Ehrhard had a conversation with a deputy, Joseph Ricca, about the public affairs aspect of their work. Thus, at least as of January 1985 she knew that the Secretary saw her job as director of SOS West to be partly one of

"public affairs," and that he saw success in "public affairs" as important to his own aspirations for reelection and higher office.

7. In addition to the directors' meetings, in October 1984 Ehrhard was invited to a meeting of political supporters where Connolly spoke about his future political plans. Ehrhard also continued to be politically active on Connolly's behalf while she was director of SOS West. She hosted a party for his supporters in March 1985, and she ran for the position of delegate to the Democratic state issues convention.

## III.

■ The facts that we have mentioned, along with the other evidence in the record, make clear to us that political affiliation, or political loyalty, is an appropriate qualification for the position of Director of SOS West. For one thing, the SOS West office, though small, is one of only two offices in the state, with responsibility for its western portion. For another thing, the office deals directly with the public, providing its services on an individual basis. Further, the office provides information, not simply about corporate registrations or state regulations, but about "any question that any of the citizens of the state might have" about the workings of state government. As Ehrhard and the other witnesses described this aspect of the job, it seems less like providing a purely technical government service, such as water or electricity, than like providing direct, person-to-person assistance, the type of "case work" for political constituents that is the very bread and butter of local political life. Finally, the office sought to make members of the public aware that a particular elected official, Michael Connolly, had provided the services they had obtained. (Indeed, Ehrhard herself proposed using the "glad-to-have-been-of-service" card at SOS West. The Secretary's deputies approved the card, though they removed Ehrhard's own name, which she had wished to include on the card.)

Given SOS West's involvement in providing public information and referrals, in helping to solve citizens' problems, and in

"public relations," we believe that "there is room for political disagreement" about how the office should be run, and about "its goals or their implementation." *Jimenez Fuentes*, 807 F.2d at 241–42. The political "goals or programs" of different Secretaries of State might directly affect the "direction, pace, or quality" of the work at SOS West. *Id.* It is true that the matters at stake in Ehrhard's job relate more directly to the personal political career of an official who seeks reelection or nomination within a party, than to the platforms of competing parties. But, we see no reason why that fact should make a critical difference when applying the *Branti* rule. Working to ensure the popularity and success of a particular elected official is as close to the heart of "politics" as is supporting a particular viewpoint on political issues.

Ehrhard argues that she was not aware of the overtly political tasks the Secretary wished her to undertake, such as being his "eyes and ears" in Western Massachusetts, and that her decisionmaking authority in her job was limited. We agree that a jury might find that her "particular responsibilities" as director of SOS West did not involve final policymaking authority. They did, however, involve "input" into hiring decisions, supervision of employees, and development of office policies and practices, such as the Central Information Service cards, mailing system, and working hours. The position of regional director is an administrative position within the Secretary's organization, and is described as a "policymaking" position for financial disclosure purposes. Ehrhard was also "privy to confidential information" about the Secretary's plans and opinions, including overtly political plans and opinions. And her basic, everyday job involved "communica[tion]" with the public. These facts, taken together, make clear that Ehrhard did not fulfill a purely clerical or technical role within the office; her job is within the standard set forth in *Jimenez Fuentes*.

In *Jimenez Fuentes* we found that "regional directors" who did not have "final policy-making authority" still held a policy-

making position, because they were "sole directors of an entire region," and acted as "the alter ego of the Executive Director at the regional level." *Id.* at 245. Similarly, Ehrhard was the only administrative official in Western Massachusetts, and she, by running SOS West, represented the Secretary to the citizens of Western Massachusetts. Also, in other cases involving regional directors whose duties resembled Ehrhard's, we have held that at the least, there was no "clearly established" legal protection against political dismissal. For example, in *Quintana v. Anselmi*, 817 F.2d 891, 892–93 (1st Cir.1987), the plaintiff's duties, like Ehrhard's, included recommending personnel actions, representing the organization in community activities, supervising the implementation of programs, and establishing internal office procedures. In *Rodriguez Rodriguez v. Munoz Munoz*, 808 F.2d 138, 140 (1st Cir. 1986), the plaintiff "was responsible for implementing at the regional level the Agency's 'mission,' " and his job was classified as a "trust" position under Puerto Rico law, much as Ehrhard's job was designated as a policymaking position under Massachusetts law.

Ehrhard's job had enough in it of a "policymaker, a privy to confidential information" and a "communicator" to make political affiliation "an ... appropriate requirement." *Jimenez Fuentes*, 807 F.2d at 842. Therefore, even assuming defendants fired her for political reasons, their action did not violate the First Amendment.

Since the "rebuttal evidence" that Ehrhard wished to present did not concern the nature of her job, we need not consider her claim that the court improperly refused to permit her to present it.

The judgment of the district court is

AFFIRMED.