**Mary A. PARELLA**

v.

**Bruce G. SUNDLUN, et al.**

**Civ. A. No. 91–0461 P.**

United States District Court, D. Rhode Island.

Jan. 14, 1992.

Joseph M. Codega, Arlene Marie Violet, Arlene Violet & Law Assoc., Barrington, R.I., for plaintiff.

Judith Colenback Savage, Casby Harrison, W. Mark Russo, John A. Tarrantino, Adler, Pollock & Sheehan, Inc., Providence, R.I., for defendants.

## MEMORANDUM AND ORDER

PETTINE, Senior District Judge.

Defendants in the above-captioned case have petitioned this Court for summary judgment. Defendants advance two arguments in support of their motion. First, they argue that party affiliation is an appropriate requirement for the position in which plaintiff was formerly employed; thus, defendants were legally entitled to fire plaintiff because of her party affiliation. Second, defendants contend they are entitled to qualified immunity even if party affiliation is *not* an appropriate criterion for plaintiff's position. This second argument need not be addressed by the Court; summary judgment is granted on

the basis of defendants' first line of reasoning.[1]

# I

The State of Rhode Island employed the plaintiff as Executive Director of the Governor's Justice Commission from late August, 1987 until approximately June 10, 1991. Plaintiff is also an active member of the Republican party and serves as an elected member of the Bristol, Rhode Island Town Council. Plaintiff's Complaint alleges that she was wrongfully terminated from state employment on the basis of her political party affiliation.[2]

The state legislature created the Governor's Justice Commission to facilitate the reduction of crime and delinquency in Rhode Island. The Commission is empowered to administer grant programs, advise the governor with respect to criminal justice policies and budgets, prepare the governor's criminal justice plan, monitor and evaluate criminal justice programs throughout the state, apply for and utilize government funds, collect criminal justice data, disseminate criminal justice information, and review state correctional services. R.I.G.L. § 42–26–4. Broadly speaking, the Justice Commission serves as advisor to, and representative of, the governor with respect to criminal justice policies and programs statewide.

The Justice Commission consists of a "criminal justice policy board, [a] full-time administrator and staff, and [ ] such permanent ad hoc committees and task forces as the board deems necessary." R.I.G.L. § 42–26–3. The executive director of the Justice Commission is appointed by the governor "from a list of three (3) candidates submitted by the criminal justice policy board." R.I.G.L. § 42–26–9. The legislatively-mandated responsibilities of the Executive Director are to:

(1) Supervise and be responsible for the administration of the policies established by the policy board;

(2) Establish, consolidate, or abolish any administrative subdivision within the commission and appoint and remove for cause the heads thereof, and delegate appropriate powers and duties to them;

(3) Establish and administer projects and programs for the operation of the commission;

(4) Appoint and remove employees of the commission and delegate appropriate powers and duties to them;

(5) Make rules and regulations for the management and the administration of policies of the commission and the conduct of employees under his/her jurisdiction;

(6) Collect, develop and maintain statistical information, records, and reports as the commission may determine relevant to its functions;

(7) Transmit bi-monthly to the policy board a report of the operations of the commission for the preceding two calendar months;

(8) Execute and carry out the provisions of all contracts, leases, and agreements authorized by the commission with agencies of federal, state or local government, corporations or persons;

(9) Perform such additional duties as may be assigned to him or her by the

---

**1.** Before granting a motion for summary judgment under Fed.R.Civ.P. 56, this Court must find that there is "no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247–48, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). The facts must be viewed in the light most favorable to the non-moving party. *Griggs–Ryan v. Smith,* 904 F.2d 112, 115 (1st Cir.1990). If, viewed in such light, there does appear to be a factual controversy, "it must have substance in the sense that it limns differing versions of the truth which a factfinder must resolve at an ensuing trial." *Mack v. Great Atlantic and Pacific Tea Co., Inc.,* 871 F.2d 179, 181 (1st Cir.1989).

**2.** Upon information and belief in making a decision to terminate plaintiff's employment, employees in defendant Sundlun's office were substantially motivated by political considerations. The political considerations include whether the individual under consideration is a Democrat, a relative or friend of a Democrat, is sponsored by an influential Democrat, is a financial or political supporter of the Democrat party, or of defendant Sundlun or other influential Democrats. Pltf's. Complaint at 5–6.

governor, the policy board, or by law; and

(10) Exercise all powers and perform all duties necessary and proper in carrying out his or her responsibilities.

R.I.G.L. § 42–26–9(b).

## II

Defendants claim that "even if Parella were terminated because of her party affiliation ... [it] is an appropriate requirement for the office of Executive Director of the Justice Commission. The office at issue is exempt from the prohibitions preventing the dismissal of low-level public employees solely on the basis of political affiliation." Def's Memo. at 2–3. A review of relevant Supreme Court and First Circuit case law regarding politically-motivated employment termination compels this Court to agree with the defendants.

In *Elrod v. Burns,* 427 U.S. 347, 369–70, 96 S.Ct. 2673, 2687–88, 49 L.Ed.2d 547 (1976), the Supreme Court condemned political patronage [3] as "a very effective impediment to the associational and speech freedoms which are essential to a meaningful system of democratic government," and held that "the practice of patronage dismissals is unconstitutional under the First and Fourteenth Amendments...." *Id.* at 373, 96 S.Ct. at 2689. However, the Court recognized that political loyalty is a relevant and appropriate qualification for certain jobs, and carved out an exception to its holding for what it termed "policymaking positions." *Id.* at 367, 96 S.Ct. at 2687. The Court acknowledged the difficulty of distinguishing policymaking from non-policymaking jobs, but suggested that "[a]n employee with responsibilities that are not well defined or are of broad scope ... [and who] acts as an adviser or formulates plans for the implementation of broad goals" would be exempt from the ban on political firing. *Id.* at 368, 96 S.Ct. at 2687.

In *Branti v. Finkel,* 445 U.S. 507, 517, 100 S.Ct. 1287, 1294, 63 L.Ed.2d 574 (1980), the Court reaffirmed the basic principles outlined in *Elrod,* stating, "if an employee's private political beliefs would interfere with the discharge of his public duties, his First Amendment rights may be required to yield to the State's vital interest in maintaining governmental effectiveness and efficiency." Noting that, "[u]nder some circumstances, a position may be appropriately considered political even though it is neither confidential nor policymaking in character," the Court went on to refine its previous definition of those jobs for which political affiliation would be an appropriate criterion. *Id.* at 518, 100 S.Ct. at 1294. The *Branti* Court enunciated its test for determining whether an employee's political affiliation was an appropriate job qualification as follows: "[T]he question is whether the hiring authority can demonstrate that party affiliation is an appropriate requirement for the effective performance of the public office involved." *Id.*

The First Circuit has had numerous opportunities to apply the guidelines first laid down in *Elrod* and *Branti.* This Circuit first outlined its approach to political termination cases in *Jimenez Fuentes v. Torres Gaztambide,* 807 F.2d 236 (1st Cir.1986). The *Jimenez Fuentes* Court articulated a two-pronged inquiry to be used in such cases. As the threshold question, a court must ask: "Do party goals or programs affect the direction, pace, or quality of governance?" *Id.* at 242. If the answer to this first question is affirmative, the second question follows: Does the officeholder "resemble[ ] a policymaker, a privy to confidential information, a communicator, or some other office holder whose function is such that party affiliation is an equally appropriate requirement?" *Id.* Answers to these questions are to be based on the "inherent powers" of the office itself (as opposed to the powers actually exercised by the particular *officeholder* ). *Id.* Finally, the Court in *Jimenez Fuentes* instructed judges to "weigh all relevant factors and make a common sense judgment" in determining whether or not a given job is

---

**3.** The Court described political patronage as a system under which "public employees hold their jobs on the condition that they provide, in some acceptable manner, support for the favored political party." *Id.* at 359, 96 S.Ct. at 2683.

exempt from the ban on politically-motivated employment termination. *Id.*

The First Circuit has applied the general principles set out in *Jimenez Fuentes* to a long series of cases, and it is useful to summarize the holdings of several of these opinions before evaluating the political nature of the job at issue in the instant case. In *Monge–Vazquez v. Rohena–Betancourt,* 813 F.2d 22 (1st Cir.1987), the First Circuit held that the office of Director of the Puerto Rico Office of Education and Community Relations for the Environmental Quality Board was unprotected from politically-motivated termination. The Court explained its rationale as follows:

> [T]he EQB is charged with a politically sensitive mission and potentially deals with issues involving partisan interests and concerns on a routine basis ... the EQB's mandate includes both recommending 'public policy to encourage and promote the improvement of environmental quality' and establishing 'standards for the quality and purity of the environment.'

*Id.* at 24. In the same decision, the First Circuit held that the Regional Director of the Department of Natural Resources was not constitutionally protected against political dismissal because he was "employed by an agency which formulates and implements public policies that potentially implicate partisan interests." *Id.* at 25–26.

> Although not ultimately responsible for formulating the broad contours of the DNR's public policy, a Regional Director does possess the vast responsibility for directing all agency programs, representing the Secretary [of Natural Resources], and implementing the agency's broad policies at the regional level. Successfully completing these various duties necessarily requires a Regional Director to perform a mix of the policymaking, confidential, and communicative tasks envisioned by *Elrod v. Burns, Branti,* and their progeny.

*Id.* at 26 (citations omitted).

Similarly, in *Rodriquez–Burgos v. Electric Energy Authority,* 853 F.2d 31 (1st Cir.1988), the Court held that the position of Head of the Material Management Division of the Puerto Rico Electric Power Authority was exempt from the ban on politically-motivated employment termination. Because this position was only two steps below that of Executive Director, involved supervision of a "large number" of employees, encompassed "broad policymaking responsibilities," and was "marked by a high degree of autonomy, self-initiative, and 'self-judgment,'" the court found that political affiliation was an appropriate qualification for the job. *Id.* at 36.

In *Cordero v. DeJesus–Mendez,* 867 F.2d 1 (1st Cir.1989), the Court held that politically-motivated termination of a municipal personnel director was constitutionally permissible. In reaching this decision, the Court focused its attention on three factors in particular: the fact that the personnel director is appointed by the mayor, the fact that the personnel director is directly responsible to the mayor, and the fact that the mayor has the authority to terminate the personnel director's employment when it is "necessary or convenient" to do so. *Id.* at 12–13.

Finally, in *McGurrin Ehrhard v. Connolly,* 867 F.2d 92 (1st Cir.1989), the position of director of the Massachusetts Secretary of State's Western Massachusetts office was held to legitimately require party loyalty; thus, politically-motivated termination of the director's employment did not violate her constitutional rights. The Court noted that, although the director did not have "final decisionmaking authority," this fact alone was not dispositive. The director had "'input' into hiring decisions, supervision of employees, and development of office policies and practices ... [a]nd her basic everyday job involved 'communica[tion]' with the public." *Id.* at 95. These factors helped convince the Court that the position of director rightly falls outside the realm of jobs constitutionally protected from politically-motivated termination.

### III

▇ It seems clear from the above that the position of Executive Director of the Governor's Justice Commission is an inher-

ently political post, exempt from the constitutional ban on politically-motivated employment termination. The Court is inclined to agree with defendants' characterization of crime/delinquency prevention and reduction (the raison d'etre of the Justice Commission) as "politically charged issues." Def's Memo. at 8. Political campaigns have met with success or failure in part due to candidates' differing criminal justice platforms.[4] In short, it would be wholly disingenuous to suggest that criminal justice is an apolitical issue.

■ For our discussion, however, it is not sufficient for the Justice Commission's work to be political in nature. This Court must also be satisfied that the position of Executive Director of the Commission is appropriately filled by a person whose political affiliation is in concert with that of the governor. Plaintiff contends "there is no evidence before the Court that political affiliation is an appropriate factor for the executive director of the Commission." Pltf's Memo. at 5. On the contrary, however, both the statutory description of plaintiff's job (set forth above) and plaintiff's deposition testimony provide a sufficient basis for this Court's conclusion that political affiliation *is* a relevant criterion for the executive director.

To briefly reiterate, R.I.G.L. § 42–26–9(b) empowers the executive director to engage in policy implementation; employee hiring, firing, and supervision; and creation and administration of new programs. This list of responsibilities is not exhaustive; I am merely highlighting the facets of the job which convince me the position of executive director is inherently political.

Plaintiff's own words convince this Court of the political nature of her position. Plaintiff has described the bulk of her job as follows: "I participate in the decision making process in the areas of personnel, policy development, research and education." Pltf's. Dep. at 17; Pltf's.Dep.Ex.

4. Plaintiff's Complaint further states that, in her capacity as Executive Director, she "plans, organizes, and directs the work of the Governor's Justice Commission in accordance with the policies and objectives established by the Policy Board and the Governor." Pltf's.Dep.Ex. 1. From this, I infer that Plaintiff's position is clearly not akin to that of a mere clerk.

Plaintiff's job is no less political than that of Director of the office of Education and Community Relations for the Environmental Quality Board (*Monge–Vazquez*, 813 F.2d at 22), Regional Director of the Department of Natural Resources (*id.*), Director of the Secretary of State's regional office (*McGurrin Ehrhard*, 867 F.2d at 92), or the other jobs classified within this Circuit as unprotected from politically-motivated termination. As Executive Director, plaintiff could potentially hinder the Governor's efforts to implement his criminal justice platform. While she may not be a policymaker per se, her responsibilities clearly would allow her to be less than an asset to a governor whose political views she did not share. Given this, it is understandable and appropriate for a new governor to replace an executive director of a rival political party with one on whose political loyalty he could rely.

## IV

I find that the position of Executive Director of the Governor's Justice Commission is inherently political, and is thus exempt from the constitutional ban on politically-motivated employment termination. Therefore, defendants did not violate plaintiff's constitutional rights by firing her, and defendants' summary judgment motion is hereby granted.

SO ORDERED.

---

4. By repeatedly referring to the "Willie Horton furlough incident" throughout the 1988 presidential campaign, George Bush attacked his opponent's overly "soft" approach to crime. *See, e.g.,* Maureen Dowd, *Bush Portrays His Oppo-* nent as Sympathetic to Criminals, N.Y. Times, October 8, 1988, at A1; Bernard Weinraub, *Campaign Trail: Crime Ads and Punishment,* N.Y. Times, October 17, 1988, at A16.