**David D. CLAYTON and Karen A. Pare, Plaintiffs,**

**v.**

**TOWN OF WEST WARWICK, Kathryn O'Hare, Individually and in her capacity as Mayor of the Town of West Warwick, Rosemary Davis, in her capacity as Finance Director of the Town of West Warwick, James Andruchow, in his capacity as Director of Public Works, Jean Roch, Richard Padula, Jean Tellier, Jr., Robert B. Morehead, Albert Manning, in their capacities as members of the West Warwick Town Council.**

**Civ. A. No. 93–393L.**

United States District Court,
D. Rhode Island.

Sept. 11, 1995.

Gerard P. Cobleigh, Robert E. Savage, Cobleigh, Watt, Rock & Giacobbe, Warwick, RI, for Plaintiffs.

Peter J. Cerilli, Cerilli, McGuirl & Bicki, Providence, RI, for Defendants.

## DECISION AND ORDER

LAGUEUX, Chief Judge.

This matter is before the Court on the Motion for Summary Judgment filed by all defendants. Defendants move for summary judgment on all four Counts contained in Plaintiffs' Amended Complaint.

Plaintiffs bring this action pursuant to 42 U.S.C. §§ 1983, 1985 and 1988. Plaintiffs allege that defendants terminated their employment with the Town of West Warwick in the positions of town clerk and building official respectively and that violated the First Amendment as well as the due process and equal protection clauses of the Fourteenth Amendment to the United States Constitution. In addition, plaintiffs allege that defendants violated art. 1, §§ 2 and 21 of the Rhode Island Constitution. Plaintiffs seek declaratory judgments and additional relief pursuant to 28 U.S.C. §§ 2201 and 2202.

## I. FACTS

The following facts are undisputed, except as noted. Plaintiff David D. Clayton ("Clayton") was appointed town clerk of West Warwick in November 1990 by then-Mayor Michael Levesque ("Mayor Levesque"), a Republican. Plaintiff Karen A. Pare ("Pare") was appointed building official of West Warwick in November 1990.[1] Both Clayton and Pare are citizens of Rhode Island.

---

1. Under the Rhode Island State Building Code, R.I.Gen.Laws §§ 23–27.3–100.0 to 23–27.3–13 (1989), Pare's position is referred to as the "local building official." The Court's decision will refer to the position as the "building official," although that term was not incorporated into West Warwick's Home Rule Charter.

In November 1986, the voters of West Warwick approved the Home Rule Charter for the Town of West Warwick (the "Charter"). The Charter set forth the town's form of government and the terms of employment for certain town employees and officials. The Charter expressly prescribed the terms of employment for the position of town clerk. It provided that "[t]here shall be a town clerk who shall be appointed by the mayor with confirmation of the town council." Charter art. X, § 1001. The town clerk's duties were enumerated as follows:

The town clerk shall be the clerk of the town council, clerk of the probate court, clerk of the board of canvassers, clerk of the financial town meeting and the recorder of deeds. It shall be the duty of the town clerk to:

(A) Make a permanent record of all proceedings and certify by the clerk's signature all actions of the aforesaid bodies;

(B) Be custodian of the town seal and of the official documents and records of the town;

(C) Direct and supervise the recordings of deeds, mortgages, vital statistics, license and permits and such other records as shall by ordinance and state law be required to be kept by the town clerk;

(D) Issue marriage licenses, burial permits, and such other licenses and permits as are required by ordinance and state law to be issued by the town clerk;

(E) Perform such other duties as may be prescribed by this charter or by state law pertaining to town clerks, and such other duties appropriate to the office as the mayor and the town council may require.

Charter art. X, § 1003. The tenure in office for the town clerk was prescribed by the following provision:

The tenure in office of all officials and employees of the town appointed by the mayor and confirmed by the council shall terminate upon the expiration of the current term of the mayor who appointed and confirmed, them, but in no case later than the sixtieth (60th) day following [the] expiration of said term of the mayor.

Charter art. IX, § 916.

The Charter also expressly provided for the position of building official. The section of the Charter pertaining to the department of public works provided:

There may be within the department of public works the division of code enforcement and inspection, the head of which shall be appointed by the director of public works and approved by the mayor. The division shall be responsible for all building code enforcement, minimum housing code enforcement, the enforcement of zoning regulations, and all related functions and responsibilities which are within the jurisdiction of the town under state law and town ordinances not inconsistent therewith. All inspectors and other personnel responsible for enforcing such laws and regulations shall be under the jurisdiction of the division, and the general supervision of the director of public works. The head of said division may conduct personally such portion of the inspection functions of the division as he or she may be qualified to perform.

Charter art. XV, § 1506.

Clayton was appointed town clerk of West Warwick by Mayor Levesque in November 1990 and served in that capacity until November 1992. During the last five months of his tenure as town clerk, Clayton also served as acting personnel director for West Warwick. At the time Clayton was appointed town clerk, he had no prior experience working in municipal government. He was not involved in Mayor Levesque's campaigns for either mayor or governor, and he made no financial contributions to either campaign. Clayton never held himself out as a Republican. He was never registered as a Republican, never served on a Republican committee, and never voted in a Republican primary. In the past he had made political contributions to both Democratic and Republican candidates. Nevertheless, Clayton alleges that in the eyes of Mayor Kathryn O'Hare ("Mayor O'Hare"), the Democrat who succeeded Mayor Levesque, he was associated with Republican Mayor Levesque.

Pare was appointed the building official of West Warwick in November 1990 by the director of public works, James Andruchow. Her appointment was approved by Mayor Levesque and confirmed by the town council. Pare served as building official until November 1992. Prior to her appointment, her only work experience was with her family's construction company. Like Clayton, Pare does not consider herself to be either a Democrat or a Republican, and has never held herself out as a member of either party. She never registered as a member of a political party, and the only primary she ever voted in was a Democratic primary in 1992. After voting in that primary, Pare disaffiliated herself from the Democratic party.

Pare never worked on a campaign for any political candidate, including Mayor Levesque. The only political contribution she ever made was to purchase tickets to the Mayor's Ball while she was serving as building official in Mayor Levesque's administration. Despite Pare's marked lack of political activity on behalf of either Republicans or Democrats, like Clayton, Pare alleges that Mayor O'Hare associated her with Republican Mayor Levesque.

The events that culminated with the filing of this lawsuit commenced on November 16, 1992, when Mayor O'Hare succeeded Mayor Levesque in office. On November 16, 1992, Mayor O'Hare sent a letter to all West Warwick department heads asking them to submit their resignations. Clayton and Pare each received the letter, which informed them that their terms of office had expired pursuant to art. IX, § 916 of the Charter. The letter further provided, "I will be announcing today that all job positions appointed by the mayor will be advertised. Considering your service to our community, I invite you to submit a letter of interest, as well as your resume, to be considered for re-appointment during my administration." Neither Clayton nor Pare agreed to resign as requested in the letter. However, both Clayton and Pare did re-apply for their positions and both submitted their resumes for consideration.

The O'Hare administration solicited applications for both the town clerk and building official positions. A committee comprised of twelve to fifteen members, none of whom were members of Mayor O'Hare's campaign staff, screened the numerous resumes that were submitted for both positions. Five or six applicants were selected to interview for the town clerk position. Clayton's application was not selected for further consideration. Ultimately, Frank Conti ("Conti") was appointed by Mayor O'Hare as the new town clerk for West Warwick. Defendants allege that Conti had no political affiliation, and was not involved with Mayor O'Hare's campaign.

Eight to ten applicants were selected to interview for the building official position. Pare was not among them. Ultimately, Richard Belham ("Belham") was appointed as the building official. Belham had years of experience as a building official, and had no affiliation with either political party.

Mayor O'Hare's acting chief of staff sent letters to Clayton and Pare thanking them for their service and informing them that their municipal employment was terminated. Clayton requested a hearing before the town council, and a hearing was scheduled. However, on the day of the hearing, Clayton was unable to attend. He did not send a representative to the meeting, and later he learned that his hearing had been tabled indefinitely. Clayton made no further efforts to secure a hearing on the matter.

Pare also requested a hearing before the town council because she believed that her termination was "politically motivated." A hearing was scheduled, and Pare attended, but the matter was tabled. Like Clayton, Pare took no further action to have the matter heard by the town council. Instead, Clayton and Pare filed this lawsuit.

Both Clayton and Pare allege that they were terminated and not reappointed because the administration of Mayor O'Hare, a Democrat, believed that they were politically affiliated with former Mayor Levesque, a Republican. Counts I and IV of the Amended Complaint are averred by Clayton and Counts II and III are averred by Pare. In Counts I and II, plaintiffs allege that by terminating their employment and failing to reappoint them to their former positions, de-

fendants violated plaintiffs' rights to free speech and association under both the First Amendment to the United States Constitution and art. I, § 21 of the Rhode Island Constitution. In Counts III and IV, plaintiffs allege that they were denied their property rights in their positions without due process of law in violation of the Fourteenth Amendment to the United States Constitution.

Plaintiffs' Amended Complaint seeks the following relief: (1) a declaratory judgment that the alleged political patronage system in West Warwick violates the First Amendment to the United States Constitution; (2) a declaratory judgment that the alleged political patronage system violates the due process clause of the Fourteenth Amendment to the United States Constitution; (3) a declaratory judgment that the alleged political patronage system violates the equal protection clause of the Fourteenth Amendment to the United States Constitution; (4) a declaratory judgment that the alleged political patronage system violates art. 1, § 2 of the Rhode Island Constitution; (5) a declaratory judgment that the alleged political patronage system violates art. 1, § 21 of the Rhode Island Constitution; (6) a declaratory judgment that plaintiffs were denied procedural due process in violation of the Fourteenth Amendment to the United States Constitution; (7) a declaratory judgment that plaintiffs had property interests in their positions under the Fourteenth Amendment to the United States Constitution; (8) a declaratory judgment that defendants did not have just cause to remove plaintiffs from their positions; (9) an injunction preventing defendants from maintaining and operating the alleged political patronage system; (10) compensatory damages; (11) punitive damages; (12) attorneys fees, costs and expenses; and (13) further appropriate relief, including the reinstatement of plaintiffs to their former positions.[2] Defendants moved for summary judgment on all Counts, and the matter is now in order for decision.

## II. DISCUSSION

### A. Summary Judgment Standard

Rule 56(c) of the Federal Rules of Civil Procedure sets forth the standard for a court ruling on a summary judgment motion:

> The judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.

In determining whether summary judgment is appropriate, the Court must view the facts on the record and all inferences therefrom in the light most favorable to the non-moving party. *Continental Cas. Co. v. Canadian Universal Ins. Co.*, 924 F.2d 370, 373 (1st Cir.1991). Additionally, the moving party bears the burden of showing that there is insufficient evidence in the record to support the non-moving party's position. *Celotex Corp. v. Catrett*, 477 U.S. 317, 325, 106 S.Ct. 2548, 2554, 91 L.Ed.2d 265 (1986). If that showing is made, the motion can then be granted if, as a matter of law, the moving party is entitled to judgment in its favor.

### B. First Amendment

 Plaintiffs allege in Counts I and II of their Amended Complaint that defendants' dismissal and subsequent failure to reappoint Clayton and Pare constituted patronage dismissals in violation of plaintiffs' rights to free speech and association under the First Amendment to the United States Constitution.[3] In *Elrod v. Burns*, 427 U.S. 347, 355, 96 S.Ct. 2673, 2680–81, 49 L.Ed.2d 547 (1976), the United States Supreme Court rec-

---

2. According to Supplemental Affidavits filed by plaintiffs, Clayton and Pare were both appointed to fill their former positions as town clerk and building official, respectively, on February 9, 1995, and both began work in those capacities on February 13, 1995.

3. The First Amendment provides, "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof; or abridging the freedom of speech, or of the press; or the right of the people peaceably to assemble, and to petition the government for a redress of grievances." The First Amendment is applicable to states and municipalities through the due process clause of the Fourteenth Amendment. *Fiske v. Kansas*, 274 U.S. 380, 47 S.Ct. 655, 71 L.Ed. 1108 (1927).

ognized that the patronage dismissal of a public employee imposes significant restraints on the employee's freedoms of belief and association. "Patronage ... to the extent it compels or restrains belief and association, is inimical to the process which undergirds our system of government and is 'at war with the deeper traditions of democracy embodied in the First Amendment.'" *Id.* at 357, 96 S.Ct. at 2682 (quoting *Illinois State Employees Union v. Lewis,* 473 F.2d 561, 576 (7th Cir.1972) *cert. denied,* 410 U.S. 928, 93 S.Ct. 1364, 35 L.Ed.2d 590 (1973)). Therefore, patronage practices impermissibly restrict First Amendment freedoms unless they are narrowly tailored to further vital government interests. *Rutan v. Republican Party of Illinois,* 497 U.S. 62, 74, 110 S.Ct. 2729, 2736, 111 L.Ed.2d 52 (1990). If a plaintiff can prove that political affiliation was the substantial or motivating factor inducing his or her dismissal, and defendants are unable to demonstrate a legitimate, non-political rationale for the dismissal, then the plaintiff's First Amendment rights have been infringed. *Mt. Healthy City School Bd. of Educ. v. Doyle,* 429 U.S. 274, 285–87, 97 S.Ct. 568, 575–76, 50 L.Ed.2d 471 (1977).

■ The Supreme Court has recognized, however, that political loyalty is a necessary qualification for some government positions. *Rutan,* 497 U.S. at 74, 110 S.Ct. at 2736–37; *Branti v. Finkel,* 445 U.S. 507, 517, 100 S.Ct. 1287, 1294, 63 L.Ed.2d 574 (1980); *Elrod,* 427 U.S. at 367, 96 S.Ct. at 2686. As the Supreme Court noted in *Branti,* "[I]f an employee's private political beliefs would interfere with the discharge of his public duties, his First Amendment rights may be required to yield to the State's vital interest in maintaining governmental effectiveness and efficiency." 445 U.S. at 517, 100 S.Ct. at 1294. Accordingly, patronage dismissals are unconstitutional under the First and Fourteenth Amendments unless the plaintiff occupied a position where political affiliation was an appropriate requirement for the effective performance of the duties of that office. *Branti,* 445 U.S. at 518, 100 S.Ct. at 1294–95; *Jimenez–Fuentes v. Torres Gaztambide,* 807 F.2d 236, 240 (1st Cir.1986) *cert. denied,* 481 U.S. 1014, 107 S.Ct. 1888, 95 L.Ed.2d 496 (1987). These constitutional restrictions apply not only to patronage dismissals, but also to hiring, promotions, transfers and recalls after layoffs based on political affiliations. *Rutan,* 497 U.S. at 78–79, 110 S.Ct. at 2739.

■ The threshold issue, therefore, in a case where a plaintiff alleges that his or her dismissal from a government position was based on political patronage, is "whether the hiring authority can demonstrate that party affiliation is an appropriate requirement for the effective performance of the public office involved." *Jimenez–Fuentes,* 807 F.2d at 240 (quoting *Branti,* 445 U.S. at 518, 100 S.Ct. at 1294). Whether political affiliation is an appropriate criterion for a particular government position is a question of law for the court to decide. *McGurrin Ehrhard v. Connolly,* 867 F.2d 92, 93 (1st Cir.1989). If the court determines that political affiliation is an appropriate criterion for the position in question, then the plaintiff can not prevail on his or her First Amendment claim regardless of whether political affiliation was the motivating factor leading to his or her dismissal.

■ The First Circuit Court of Appeals, in *Jimenez–Fuentes,* set out a two-part test to guide the lower courts in deciding whether political affiliation is an appropriate criterion for a particular public position. First, the Court must determine whether the position in question involves "governmental decision making on issues where there is room for political disagreement on goals or their implementation." 807 F.2d at 241–42. In other words, do "party goals or programs affect the direction, pace, or quality of governance?" *Id.* At 242. If the position is such that the officeholder would be involved in matters where there was even the potential for partisan differences, then political affiliation is more likely to be an appropriate qualification for that position. *See Mendez–Palou v. Rohena–Betancourt,* 813 F.2d 1255, 1258 (1st Cir.1987). Second, the Court must consider the particular responsibilities of the position to determine whether its occupant resembles a policymaker, a privy to confidential information, a communicator, or some other officeholder whose function is such that political affiliation is an appropriate criterion. *Jimenez–Fuentes,* 807 F.2d at 242. The

court's inquiry must focus on the inherent nature of the office itself, not on the role played by a particular officeholder. *Id.* In this case, therefore, the Court must apply the elements of the two-part analysis set forth in *Jimenez–Fuentes* to determine whether political affiliation was an appropriate criterion for the positions of town clerk and building official in West Warwick.

### 1. Town Clerk

In examining the nature of the position of town clerk in West Warwick, the Court looks first to the pertinent provisions of West Warwick's Charter. The Charter, of course, is not dispositive of Clayton's First Amendment rights. *See Jimenez–Fuentes,* 807 F.2d at 246. It is, however, entitled to some deference. *See Id.* Pursuant to art. X, § 1001 of the Charter, the town clerk is appointed by the mayor and confirmed by the town council. The fact that the town clerk is appointed by the mayor suggests to the Court that the citizens of West Warwick recognize that political considerations may be pertinent to the mayor's selection of a town clerk. *See Cordero v. De Jesus–Mendez,* 867 F.2d 1, 12 (1st Cir.1989). Additionally, under art. IX, § 916, the tenure of all officials appointed by the mayor and confirmed by the town council terminates upon the expiration of the current term of the mayor who appointed them (or, at the latest, within sixty days of that date). It is therefore likely that the citizens of West Warwick intended that the town clerk's tenure would parallel the political fortunes of the mayor. This is further evidence that in West Warwick, political considerations are relevant to the position of town clerk.

The town clerk's duties, as enumerated by art. X, § 1003 of the Charter and set out in the Court's decision, *supra,* were largely clerical in nature. However, art. X, § 1003(E) of the Charter provides that the town clerk shall "[p]erform such other duties ... appropriate to the office as the mayor and the town council may require." This open-ended duty might well be better served by a town clerk who is politically affiliated with the mayor to whom he or she is responsible. As the First Circuit noted in *Jime-*

*nez–Fuentes,* when the responsibilities of a position include duties that are broad in scope or not well defined, it is more likely that political affiliation is an appropriate qualification for the position. *See* 807 F.2d at 242 (citing *Elrod,* 427 U.S. at 368, 96 S.Ct. at 2687). *See also Mendez–Palou,* 813 F.2d at 1258.

Two other factors indicate that political affiliation is a constitutionally permissible requirement for the town clerk's position. First, according to Clayton's deposition, the town clerk in West Warwick supervises the clerks who staff the town clerk's office. When a public official serves in a supervisory capacity, courts have held that political affiliation may be a relevant criterion for the position. *See McGurrin Ehrhard,* 867 F.2d at 95; *Parella v. Sundlun,* 781 F.Supp. 892, 896 (D.R.I.1992). Second, Clayton's deposition indicates that the town clerk is responsible for keeping the minutes of the West Warwick town council's executive sessions. By the town clerk's attendance at such meetings, he or she may well be privy to confidential political information about the inner workings of town government. The town clerk's access to confidential information is another factor that supports defendants' contention that the town clerk in West Warwick occupies a potentially political position. *See McGurrin Ehrhard,* 867 F.2d at 96; *Jimenez–Fuentes,* 807 F.2d at 241–42.

Plaintiffs cite *Visser v. Magnarelli,* 530 F.Supp. 1165 (N.D.N.Y.1982), in support of their argument that political affiliation in not an appropriate criterion for the position of town clerk. The federal district court in *Visser* held that political affiliation was not a relevant criterion for the city clerk's position in Syracuse, New York. 530 F.Supp. at 1173. In *Visser,* however, the city clerk was elected by the city council, not appointed by the mayor, and the city clerk's tenure in office was not statutorily linked to the terms of the officials who appointed him or her. *See Id.* at 1167. Additionally, the city clerk in *Visser* performed only narrowly defined ministerial duties. *Id.* at 1171. In contrast, the town clerk in West Warwick has more open-ended responsibilities to the mayor. In short, the position of town clerk in West

Warwick has greater potential to be influenced by politics than that of the city clerk in *Visser*. Therefore, the Court holds that political affiliation was an appropriate criterion for the mayor to consider in appointing a town clerk for West Warwick.

## 2. Building Official

The Court is also satisfied that political affiliation was an appropriate criterion for the position of building official in West Warwick. The duties and terms of employment of the building official are set forth in both the Charter and the Rhode Island State Building Code (the "Building Code"). Pursuant to art. XV, § 1506 of the Charter, the building official serves as the head of the division of code enforcement and inspection—a subdivision of the department of public works. The department of public works operates under the direction of the mayor. Charter art. XV, § 1505. The building official is appointed by the director of public works with the approval of the mayor, and works under the general supervision of the director of public works. Charter art. XV, § 1506. Pursuant to the Building Code, the building official serves at the pleasure of the appointing authority. R.I.Gen.Laws § 23-27.3-107.1 (1989). While these statutory provisions are not dispositive of Pare's constitutional rights, they do provide some insight into the nature of the building official's position. *See Jimenez–Fuentes*, 807 F.2d at 246. It is evident that while the building official is directly accountable to the director of public works, because the mayor must approve his or her appointment, and since the director of public works is appointed by and accountable to the mayor, the building official, too, is ultimately accountable to the mayor.

The building official's duties are set out in the Building Code, R.I.Gen.Laws §§ 23-27.3-107.5, 108.1-108.1.8 (1989), as well as the Charter, art. XV, § 1506. Essentially, the building official is responsible for enforcing building and housing codes promulgated at both state and municipal levels. Although the building official's enforcement duties do not constitute policymaking per se, "if government is to work, policy implementation is just as important as policymaking." *Jime-*

*nez–Fuentes*, 807 F.2d at 246 (quoting *Branti*, 445 U.S. at 530, 100 S.Ct. at 1301).

The building official is also responsible for enforcing local zoning ordinances, and in Pare's Affidavit she states that she attended the town's zoning meetings. Of all the issues that arise in municipal governance, zoning has the potential to be among the most politically divisive. Therefore, the official responsible for enforcing the town's zoning policies holds a position that clearly has the potential to be politically charged.

According to Pare's Affidavit and Deposition, as building official she attended zoning meetings, town council meetings, and the mayor's monthly meetings with all his department heads. It is clear, therefore, that the building official is likely to be privy to confidential political information. This access to confidential information is a factor that suggests to the Court that political affiliation is an appropriate qualification for the building official. *See Jimenez–Fuentes*, 807 F.2d at 241-42.

In addition, Pare's affidavit states that she performed site inspections, plan reviews, and handled minimum housing complaints—functions in which the building official serves as an intermediary between policymakers and the public. A public official's interaction with the public is a relevant factor when determining whether political affiliation is a constitutionally appropriate criterion for a public position. *See McGurrin Ehrhard*, 867 F.2d at 95. Finally, in Pare's Deposition she states that as building official she supervised two clerks and an inspector. As the First Circuit observed in *McGurrin Ehrhard*, the fact that a public official serves in a supervisory capacity is pertinent to the Court's analysis. *See id.* at 95-6. Taken together, these factors suggest that political affiliation is a relevant qualification for this position.

It is clear that political affiliation is an appropriate criterion for the positions of town clerk and building official in West Warwick. In both positions, the officeholder may well be involved in matters that have the potential for political disagreement. *See Mendez–Palou*, 813 F.2d at 1258. Additionally, the particular responsibilities of the town clerk and building official are such that

the political affiliation of each official may well bear on the efficiency and effectiveness of their performance. *See Jimenez–Fuentes,* 807 F.2d at 241–42. Accordingly, when Mayor O'Hare assumed office, she was entitled to fill those positions with persons of her own choosing. As the First Circuit explained in *Jimenez–Fuentes:*

> In order for the new administration to be given an opportunity to fulfill expectations, it must have available and also appear to have available significant facilitators of policy, people who have the personal and partisan loyalty, initiative, and enthusiasm that can make the difference between the acclaimed success of a government agency or program or its failure or, more typically, its lackluster performance.

807 F.2d at 241. Even if Clayton or Pare could prove that but for their perceived political affiliation they would not have been terminated by Mayor O'Hare, under the doctrine recognized by the Supreme Court in *Elrod* and *Branti,* plaintiffs' First Amendment rights were not violated as a matter of law. Defendants are therefore entitled to summary judgment on the First Amendment claims averred in Counts I and II of Plaintiffs' Amended Complaint.

### C. Procedural Due Process

■ In Counts III and IV of their Amended Complaint, plaintiffs contend that when they were terminated by Mayor O'Hare they were denied property rights without due process of law in violation of the Fourteenth Amendment to the United States Constitution.[4] Although the Court holds that plaintiffs' terminations did not violate their First Amendment rights because political affiliation was an appropriate criterion for their positions, the procedural due process implications of their terminations requires an independent analysis. *See Correa–Martinez v. Arrillaga–Belendez,* 903 F.2d 49, 56 (1st Cir. 1990).

■ "The requirements of procedural due process apply only to the deprivation of interests encompassed by the Fourteenth Amendment's protection of liberty and prop-

erty." *Board of Regents v. Roth,* 408 U.S. 564, 569, 92 S.Ct. 2701, 2705, 33 L.Ed.2d 548 (1972). Plaintiffs were entitled to procedural due process only if they actually had property rights in their positions as town clerk and building official of West Warwick at the time they were terminated. *See Cleveland Bd. of Educ. v. Loudermill,* 470 U.S. 532, 538, 105 S.Ct. 1487, 1491, 84 L.Ed.2d 494 (1985); *Cordero,* 867 F.2d at 16. The Court's threshold inquiry, therefore, focuses on whether such property rights existed. Only if this question is answered in the affirmative will the Court undertake the second level of analysis, which examines what process was due. *See Loudermill,* 470 U.S. at 541, 105 S.Ct. at 1492–93. In this case, it is clear that the Court need not venture beyond the threshold question.

■ Property rights are created and defined by a set of rules or understandings that arise from an independent source such as state law. *Loudermill,* 470 U.S. at 538, 105 S.Ct. at 1491; *Roth,* 408 U.S. at 577, 92 S.Ct. at 2709. In this case, the scope of plaintiffs' property rights in their municipal positions is defined by the terms of their appointment as town clerk and building official. *See Roth,* 408 U.S. at 578, 92 S.Ct. at 2709–10. Accordingly, Clayton and Pare's property rights are defined by the Charter and the Building Code, respectively, which set forth the terms of employment for their positions. *See DelSignore v. DiCenzo,* 767 F.Supp. 423, 425 (D.R.I.1991); *Joslyn v. Kinch,* 613 F.Supp. 1168, 1178 (D.R.I.1985).

> Pursuant to art. IX, § 916 of the Charter:
>
> The tenure in office of all officials and employees of the town appointed by the mayor and confirmed by the council shall terminate upon the expiration of the current term of the mayor who appointed and confirmed, them, but in no case later than the sixtieth (60th) day following [the] expiration of said term of the mayor.

The town clerk is appointed by the mayor and confirmed by the town council. Charter art. X, § 1001. Therefore, Clayton's tenure as town clerk terminated at the end of Mayor

---

4. The due process clause provides, "No state shall ... deprive any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV.

Levesque's term in office. Accordingly, he enjoyed no property right in his position at the time he was terminated by incoming Mayor O'Hare.

■ The tenure of the building official of West Warwick was not prescribed by the Charter. The provisions of art. IX, § 916 of the Charter are inapplicable to the building official because he or she was appointed by the director of public works, not the mayor. Rather, the Building Code provides that local building officials shall serve at the pleasure of the appointing authority. R.I.Gen.Laws § 23–27.3–107.1 (1989). In West Warwick, the appointing authority was the director of public works. Therefore, pursuant to the Building Code and the Charter, the building official of West Warwick served at the will of the director of public works. At-will employees do not possess property rights in their positions. *See, e.g., Cordero,* 867 F.2d at 16. Therefore, Pare had no property right in her position when she was terminated by Mayor O'Hare.

■ In their memorandum, plaintiffs allege that during the 1992 mayoral campaign, then-candidate O'Hare promised that municipal workers who were performing their jobs adequately need not fear for their positions if she were elected mayor. Plaintiffs argue that this campaign promise created a mutual understanding between the parties which gave rise to a property interest in their positions. This argument is wholly without merit and ignores both case law and common sense.[5]

■ It is true that facts and circumstances beyond the express terms of a public official's employment may give rise to a property right. *Perry v. Sindermann,* 408 U.S. 593, 601–602, 92 S.Ct. 2694, 2699–2700, 33 L.Ed.2d 570 (1972). Such facts and circumstances can form the basis for a property right where they represent well-established and mutually understood policies and practices, but they are insufficient if they merely give rise to a subjective expectancy. *Id.* In this case, the comments allegedly made by then-candidate O'Hare clearly did not give rise to property rights in plaintiffs' positions.

As the First Circuit noted in *Correa–Martinez v. Arrillaga–Belendez,* 903 F.2d 49, 54 (1st Cir.1990), statutes that prescribe the tenure of employment for public employees can not be unilaterally side-stepped by government officials so as to confer property rights on them. In this case, adopting plaintiffs' ill-considered argument would allow then-candidate O'Hare to eviscerate the pertinent provisions of both the Charter and the Building Code. Accordingly, the Court holds that neither Clayton nor Pare had a property right in their positions, and therefore, as a matter of law, they can not prevail on their claims that defendants violated their Fourteenth Amendment rights to procedural due process.

**D. Equal Protection**

■ In their Amended Complaint, plaintiffs seek a declaratory judgment holding that the patronage system in West Warwick violated their rights to equal protection of the laws in violation of the Fourteenth Amendment to the United States Constitution.[6] Although it is poorly developed, the thrust of plaintiffs' equal protection claim appears to be that Mayor O'Hare classified Clayton and Pare as being politically affiliated with Republican Mayor Levesque, and then terminated them based on that classification. Even assuming these allegations are true, if defendants did not classify plaintiffs along suspect or quasi-suspect lines, or impinge on their fundamental rights, then de-

---

5. The Court notes that at the time Mayor O'Hare allegedly made this promise, she was only a candidate, not the incumbent mayor. As such, she certainly lacked the authority to unilaterally confer any property rights on municipal employees. Additionally, it defies common sense to suggest that broken campaign promises can result in justiciable violations of procedural due process. If that were so, a landslide of due process litigation would envelope the federal courts following each November's elections.

6. The equal protection clause provides, "No state shall ... deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV. Neither plaintiffs' nor defendants' memoranda addressed the applicability of equal protection to the facts of this case, and the allegations in Plaintiffs' Amended Complaint are conclusory, at best. Therefore, the Court will not engage in extensive analysis of this claim.

fendants' conduct need only be rationally related to a legitimate governmental purpose to survive plaintiffs' equal protection challenge. *See, e.g., Federal Communications Comm'n. v. Beach Communications, Inc.,* —— U.S. ——, ——, 113 S.Ct. 2096, 2101, 124 L.Ed.2d 211 (1993); *Hoffman v. City of Warwick,* 909 F.2d 608, 621–22 (1st Cir.1990).

 Political affiliation is neither a suspect nor a quasi-suspect classification, and defendants' conduct does not implicate any fundamental rights. *See generally,* Laurence H. Tribe, *American Constitutional Law* 1439–43 (2nd ed. 1988).[7] Accordingly, defendants' conduct must satisfy only rational basis review, not intermediate or strict scrutiny. Therefore, even if Clayton and Pare were discriminated against based on their political beliefs or affiliations, they can not prevail on their equal protection claim if defendants' conduct was rationally related to a legitimate government interest.

 Given this Court's analysis of plaintiffs' First Amendment claims, *supra,* it is clear that defendants' conduct was rationally related to West Warwick's legitimate interest in maintaining government effectiveness and efficiency. This interest is well-recognized in patronage dismissal cases where political affiliation is held to be an appropriate criterion for public employment. *See, e.g., Branti,* 445 U.S. at 517, 100 S.Ct. at 1294; *Elrod,* 427 U.S. at 367, 96 S.Ct. at 2686. It is clear that the patronage system is rationally related to West Warwick's interest in the effective and efficient performance of the town clerk and building official. To hold otherwise would be incongruous in light of the Court's First Amendment analysis. Therefore, plaintiffs' equal protection claims must fail as a matter of law.

### E. Rhode Island Constitutional Claims

Finally, Plaintiffs' Amended Complaint avers that the alleged patronage system in West Warwick violated the Rhode Island Constitution, specifically art. 1, §§ 2 and 21.[8] The Rhode Island Supreme Court has not addressed the applicability of these state constitutional provisions in the context of patronage dismissals of municipal employees. This Court is not inclined to divine how the Supreme Court might decide this issue. Accordingly, because the Court grants summary judgment for defendants on all of plaintiffs' federal constitutional claims, the Court declines to exercise pendent jurisdiction over the remaining state constitutional claims. *See Jones v. State of Rhode Island,* 724 F.Supp. 25, 34 (D.R.I.1989); 13B Charles A. Wright, et al., *Federal Practice and Procedure* § 3567.1 at n. 14 (2nd ed. 1984). Therefore, plaintiffs' claims asserting violations of the Rhode Island Constitution are dismissed without prejudice.

### III. *CONCLUSION*

For the aforementioned reasons, defendants' Motion for Summary Judgement is granted as to plaintiffs' federal constitutional claims contained in Counts I, II, III and IV of Plaintiffs' Amended Complaint. Plaintiffs' claims that defendants' conduct violated the Rhode Island Constitution, as averred in Counts I and II of the Amended Complaint, are dismissed without prejudice. The Clerk shall enter judgment for all defendants to that effect forthwith.

*It is so ordered.*

---

**7.** First Amendment rights are fundamental rights for the purposes of equal protection analysis. *Police Dept. of Chicago v. Mosley,* 408 U.S. 92, 101, 92 S.Ct. 2286, 2293, 33 L.Ed.2d 212 (1972). However, as the above discussion illustrates, plaintiffs' First Amendment rights were not infringed in this case because political affiliation was an appropriate criterion for the positions of town clerk and building official in West Warwick. Accordingly, the alleged patronage system does not impinge on plaintiffs' First Amendment rights, or any other fundamental rights.

**8.** Art. 1, § 2 of the Rhode Island Constitution provides, in pertinent part, "No person shall be deprived of life, liberty or property without due process of law, nor shall any person be denied equal protection of the laws." Art. 1, § 21 of the Rhode Island Constitution provides, "The citizens have a right in a peaceable manner to assemble for their common good, and to apply to those invested with the powers of government, for redress of grievances, or for other purposes, by petition, address, or remonstrance. No law abridging the freedom of speech shall be enacted."